UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHANNON R. FRANKLIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:15 CV 894 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Shannon R. Franklin for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, pursuant to Sentence 4 of 42 U.S.C. § 405(g), the final decision of the Commissioner is reversed and the case is remanded to the defendant Commissioner for further proceedings consistent with this memorandum opinion.

# I. BACKGROUND

Plaintiff was born on May 30, 1972. (Tr. 148.) He filed his application on June 29, 2012. He alleges he became disabled on November 4, 2011 due to type 2 diabetes, depression, and back, knee, and shoulder problems. (Tr. 148-54, 179.) Plaintiff's application was denied, and he requested a hearing before an ALJ. (Tr. 99.)

The ALJ denied his application following a hearing, and the Appeals Council declined further review. (Tr. 1, 15, 51.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL AND OTHER HISTORY

Plaintiff saw internist John A. Garcia, M.D. from December 2009 through April 2011 for attention deficit hyperactivity disorder (ADHD), lumbago or pain in the muscles and joints of the lower back, muscle spasms, and anxiety.  Plaintiff stated that he had been on Adderall, used to treat ADHD, for years.  Dr. Garcia refilled Adderall and prescribed Tramadol, for lumbago; Soma, for muscle spasms; and Valium, for anxiety.  On August 3, 2011, plaintiff stated that he was doing well on his medications.  (Tr. 228-36.)

On April 26, 2012, plaintiff was seen at Wayne Medical Center with complaints of shoulder and back pain.  Plaintiff had recently moved to the area and was advised that he would receive no medication until his past medical records were reviewed.  (Tr. 264-65.)

On May 4, 2012, plaintiff returned to Wayne Medical Center for chronic lumbar pain.  Primary care physician Andrew Gayle, M.D., conducted a physical examination and ordered x-rays.  Plaintiff became upset with Dr. Gayle when advised that Dr. Garcia would not prescribe certain medications and stated that he would seek care elsewhere. (Tr. 239-41.)

On August 28, 2012, plaintiff saw family practitioner Guy Roberts, D.O., for a consultative disability examination.  Plaintiff complained of chronic pain and anxiety.  Upon examination, plaintiff's mental status was alert, he was oriented to person, place, and time, and his affect and demeanor were appropriate.  When asked why he was unable to work, plaintiff cited pain in his back and shoulders and that he thought he might have diabetes.  Dr. Roberts noted that plaintiff's pain was subjective and that he had never pursued treatment for diabetes.  Dr. Roberts's assessment was chronic pain syndrome and anxiety.  He concluded that plaintiff's physical examination did not warrant disability to any degree. (Tr. 252-56.)

On August 30, 2012, plaintiff was admitted to Mineral Area Regional Medical Center for severe depressed feelings and suicidal ideations. Internist Parthasarathi Marapareddigari, M.D., diagnosed plaintiff with newly diagnosed type 2 diabetes, depression with suicidal ideation, and anxiety disorder. Plaintiff reported he had been on a downhill slide for several years due to his illnesses, and the loss of his job, automobile, and home. As a result, plaintiff was now considering suicide. Plaintiff attempted suicide as a teen by hanging. Dr. Marapareddigari noted that plaintiff was tearful, expressed suicidal ideation, and appeared depressed. Dr. Marapareddigari prescribed Glucotrol XL and metformin, both used to treat diabetes. Additionally, Dr. Marapareddigari recommended treatment for anxiety with a psychiatrist after plaintiff's blood sugar was controlled. Plaintiff's discharge diagnoses were bipolar affective disorder, depressed episode, and uncontrolled diabetes. (Tr. 288-91, 324, 334.)

On September 3, 2012, plaintiff was transferred to the psychiatric inpatient unit at Southeast Hospital. Plaintiff told psychiatrist John T. Lake, M.D., that he believed he had bipolar disorder after conducting research on it. Plaintiff also complained of pain in his lower back, shoulders, and knees, and expressed hopefulness regarding his recent application for disability insurance benefits. Dr. Lake reported that plaintiff asked what forms he would be willing to fill out for plaintiff and seemed more motivated about that than about getting real treatment. Dr. Lake noted that plaintiff was "very vague about his symptomology, very matter-of-fact, as if he [was] reading it from a textbook." (Tr. 324.) Plaintiff claimed to be paranoid, but Dr. Lake noted that he did not appear paranoid or suspicious at all, nor did plaintiff describe symptoms suggestive of psychosis. Upon admission, Dr. Lake believed that plaintiff was malingering in order to obtain disability because he did not appear nearly as distressed as he reported. (Tr. 325.)

Plaintiff was discharged on September 6, 2012. His discharge diagnoses were bipolar affective disorder type 2, depressed episode, and non-insulin dependent diabetes. His discharge diagnosis did not include rule out malingering. By discharge, plaintiff's mood had improved and stabilized, and he had a low suicide risk assessment. (Tr. 324-27.)

On October 22, 2012, plaintiff saw psychiatrist Michael Stotler, M.D. Plaintiff reported his recent psychiatric hospitalization. He reported severe social anxiety that interfered with his ability to leave the house and see doctors. His mood cycled quickly from anger to depression to mania with recurrent crying spells and suicidal ideation. Plaintiff reported racing thoughts, paranoia, which he described as people judging him, and self-consciousness, which had caused him to get into fights in the past. On mental status examination, Dr. Stotler observed that plaintiff's mood and affect was depressed and anxious. He diagnosed bipolar affective disorder, type 1, depressed, moderate; general anxiety disorder; and ADHD. Dr. Stotler assessed a Global Assessment of Functioning (GAF) score of 44, indicating "serious" symptoms. Dr. Stotler increased plaintiff's Tegretol, an anticonvulsant, and Celexa, an anti-depressant, and changed his anxiety medication from Ativan to Klonopin. (Tr. 285-86.)

On December 6, 2012, plaintiff saw primary care doctor Thomas Spiro, M.D. Plaintiff's diabetes was under control. Dr. Spiro prescribed Ultram, for pain; Soma, for muscle spasms; and Xanax, for anxiety. (Tr. 342-43.)

Plaintiff saw Dr. Stotler again on December 19, 2012. He reported that his anger had decreased and that his moods were much more stable. Tegretol, for bipolar disorder, had provided some relief, and he had some days of feeling better. Plaintiff stated that his depression and anxiety were still severe and that he left the house only if he took extra anxiety medication. Dr. Stotler observed plaintiff's mood and affect was depressed and anxious. Dr. Stotler increased Klonopin, and added Adderall, for ADHD. (Tr. 283-85.)

Plaintiff visited Dr. Spiro on December 20, 2012, complaining of chronic pain and anxiety. Dr. Spiro noted that plaintiff's diabetes was controlled with medication. He prescribed hydrocodone for pain. (Tr. 348.)

On December 21, 2012, plaintiff was admitted to Mineral Area Regional Medical Center for a self inflicted stab wound that required stitches on his right wrist. Plaintiff had stabbed himself in the wrist with a steak knife while in a manic state during an argument with his son. Plaintiff reported a long history of impulsive behavior, ADHD, physical aggression with violence, and prior suicide attempts. He reported compliance

with medication. Bello Adejoh, M.D., a psychiatrist, noted that plaintiff's insight and judgment were impaired. Dr. Adejoh noted that plaintiff had difficulty with comprehension, but had good vocabulary and knowledge regarding his illness, particularly describing technical medical terms. Plaintiff reported sexual abuse as a child, which he thought had "totally impacted" his life. (Tr. 306.) Dr. Adejoh's impression was schizoaffective disorder, bipolar disorder, intermittent explosive disorder, and impulse control disorder. He admitted plaintiff for therapy. (Tr. 304-08.)

Dr. Adejoh sought a consultation from critical care specialist Martin Grissom, M.D. Dr. Grissom noted that plaintiff was positive for depression, anxiety, anger, suicidal or homicidal ideations, and panic attacks. He also noted that plaintiff was alert and oriented, pleasant and cooperative, and had insight into his volatility. Plaintiff told Dr. Grissom he was waiting for disability so he could collect Medicaid and a disability check. Dr. Grissom diagnosed major depression, suicidal ideation with suicidal gesture; insulin-dependent diabetes; explosive personality; and chronic pain syndrome. He concluded plaintiff's prognosis was guarded. (Tr. 308.)

During his hospitalization plaintiff participated in individual and group psychotherapy and recreational activities. He was discharged on December 26, 2012. By discharge, plaintiff's mood had improved significantly. He was well groomed, calm, and cooperative, and denied suicidal or homicidal ideation, auditory and visual hallucinations, and had fair insight and judgment. Dr. Adejoh's discharge diagnoses were schizo-affective disorder, bipolar type; intermittent explosive disorder; impulse control disorder; Cluster B personality trait; obesity, arthritis; and type 2 diabetes. He assigned a GAF score of 40, indicating some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (Tr. 322.)

On January 11, 2013, plaintiff saw Dr. Stotler. He described his recent hospitalization after cutting his wrist a few weeks ago. Plaintiff reported continued depression and crying spells. Dr. Stotler thought that plaintiff's medications were helping, but observed that his mood and affect was depressed and anxious. Plaintiff had

normal speech, logical thought process and good insight, judgment, grooming, and eye control. Dr. Stotler changed his antidepressant from Celexa to Prozac. He discontinued Tegretol, temazepam, and Klonopin, and started Valium. He assigned a GAF score of 44, indicating "serious" symptoms. (Tr. 260, 282-83.)

Dr. Stotler completed a medical source statement on February 12, 2013. He diagnosed bipolar affective disorder, depressed type; general anxiety disorder; and ADHD. Dr. Stotler found, among other things, that plaintiff had "extreme" limitations coping with stress, functioning independently, maintaining reliability, maintaining regular attendance and being punctual, completing a normal workday and workweek without interruptions from symptoms, maintaining attention and concentration for extended periods, performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 257-60.)

Plaintiff saw Dr. Spiro for follow up and medication refills on February 7, 2013. Dr. Spiro noted that plaintiff was "doing OK." (Tr. 355, 358.)

On April 4, 2013, plaintiff saw Dr. Stotler. He reported recurrent suicidal ideations, usually following a stressor, social anxiety, and self-mutilation. For example, he had impulsively cut a tattoo off of his arm. He had continued depression with crying spells. His medications were helping. Plaintiff had reduced his dose of Saphris, an antipsychotic medication, due to excessive sedation. Plaintiff reported an increased tolerance to Valium. Dr. Stotler observed that his mood and affect was depressed and anxious. Dr. Stotler increased Prozac, decreased Saphris, and started propranolol, for high blood pressure. (Tr. 280-81.)

On July 2, 2103, plaintiff was hospitalized at St. Anthony's Medical Center for a suicide attempt. His family had found him unconscious, surrounded by pill bottles. Plaintiff reported he took several extra pills and that he had a history of impulsive behavior. He reported a history of aggression, violence, and prior suicide attempts; quickly becoming suspicious of people in a social setting; loss of emotional control; and feelings of hopelessness. (Tr. 424-26.) Psychiatrist Sofia Grewal, M.D., noted that plaintiff was restless and fidgety. She noted that his speech was pressured, his mood was

6

anxious and constricted, his affect was constricted, his thought content was suicidal, and his judgment was limited. Dr. Grewal diagnosed bipolar disorder, mixed; recurrent major depression; psychotic disorder, not otherwise specified; schizoaffective disorder; and social maladjustment. Plaintiff was discharged on July 5, 2013. Plaintiff's GAF score upon discharge was 41-50, indicating "serious" symptoms, and his prognosis was "fair." (Tr. 407-11.)

On November 7, 2013, plaintiff was admitted to St. Mary's Health Center after he stabbed himself in the forearm with a steak knife and reportedly overdosed on Xanax and Soma. Plaintiff denied current suicidal thoughts. He stated that he has problems if he does not take his psychiatric medications, but that he had not been taking medications because he could not afford them. He was discharged on November 8, 2013. Upon discharge, psychiatrist Vadim Baram, M.D., noted that plaintiff was alert and oriented, not in acute distress, and that he denied suicidal or homicidal ideations. Dr. Baram diagnosed bipolar disorder, type 1, uncontrolled diabetes, chronic neuropathy, and assigned a GAF score of 40. Upon discharge, plaintiff's condition was "fair" and his prognosis was "questionable," and depended on community support, medication management, and psychotherapy. (Tr. 267, 272-74.)

Plaintiff saw Dr. Stotler on November 11, 2013. He reported his recent suicide attempt, crying spells, and financial stress. He stated that his blood glucose was very high and that his anger was out of control, precipitating most of his problems. Dr. Stotler observed that plaintiff's speech was rapid and excessive, and his mood and affect was depressed and anxious. His medications included Adderall, Lithium, used to treat the manic episode of a manic depression; melatonin; propranolol, a betablocker; Prozac, an antidepressant; Saphris, an antipsychotic; Valium, for anxiety, as well as diabetes medications. Dr. Stotler increased his Lithium and Prozac. He assigned a GAF score of 44. (Tr. 277-80.)

On August 20, 2014, approximately seven months following the ALJ's denial of his application, plaintiff submitted additional evidence to the Appeals Council that included a mental medical source statement completed by S. Bashyal, M.D., a

7

psychiatrist. Dr. Bashyal opined that plaintiff had extreme limitations with respect to behaving in an emotionally stable manner. (Tr. 8-9.)

**ALJ Hearing**

The ALJ conducted a hearing on December 19, 2013. Plaintiff appeared and testified to the following. (Tr. 51-87.) He is forty-one years old. He has a ninth grade education and lives in an apartment with his disabled wife and twenty-one-year-old son. He has past work as a commercial truck driver but stopped working in November 2011 due to his physical and mental impairments. He has difficulties working due to road rage, confrontations with his boss, and fist fights at work. (Tr. 55-58.)

His mental problems date to childhood when he was prescribed Ritalin but was eventually expelled from school. At the time of the hearing, he was taking medications, including Saphris, Prozac, Lithium, propranolol, and Xanax. Saphris helps control his mood swings but makes him sleep excessively and his jaw click. He did not take his Saphris the day of the hearing because it puts him in a coma-like state and he would not have been able to make it to the hearing. (Tr. 60-62.)

He has extreme anxiety, depression, and paranoia, as well as lower back pain, and therefore does not leave the house much. His anger has resulted in self-harm and suicidal issues. He does not really understand his behavior, such as stabbing himself or overdosing on pills. He believes that his mental health issues are worsening with age. However, his medications are effective and his condition would be worse without them. He believed that his condition was improving with medication. (Tr. 63-67.)

He is diabetic and has difficulty controlling his blood sugar. He has tingling in his feet. He has problems with his left shoulder and is unable to reach in all directions or lift much. He has back pain that incapacitates him for two to three weeks at a time and that occurred about three times in the past year. (Tr. 67-72.)

He prepares his own meals. He does laundry once a week, but does not do other household chores. He can go to the grocery store but cannot lift more than a twelve-pack of soda. He can sit and browse the internet for fifteen minutes at a time. (Tr. 73-75.)

8

He cannot perform full-time work because he cannot be on his feet for eight hours or perform a sitting job due to his lower back pain. (Tr. 76-77.)

**Decision of the ALJ**

On January 13, 2014, the ALJ determined that plaintiff was not disabled. At Step One, the ALJ found plaintiff had not performed substantial gainful activity since his November 4, 2011 alleged onset date of disability. At Step Two, the ALJ found plaintiff's severe impairments were: degenerative joint disease of the shoulder; degenerative disk disease of the lumbar spine; diabetes; and "psychiatric conditions variously diagnosed as different disorders including depression." (Tr. 20.) At Step Three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. At Step Four, the ALJ found that plaintiff had the residual functional capacity to perform a range of unskilled, sedentary work. With this residual functional capacity, the ALJ found plaintiff was unable to perform past relevant work. At Step Five, the ALJ found there were jobs that existed in significant numbers in the national economy that the claimant could perform. Therefore, the ALJ found that plaintiff was not disabled within the meaning of the Act. (Tr. 20-28.)

## III. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pates-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or

because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove that he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pates-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating that he is no longer able to return to his past relevant work. Pates-Fire, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to his past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## IV. DISCUSSION

Plaintiff argues that the ALJ erred (1) at Step Two in failing to determine his actual mental diagnoses; and (2) in giving "little weight" to the opinion of treating psychiatrist Michael Stotler, M.D. This court agrees.

1. **Step Two of the Sequential Evaluation Process**

At Step Two, the ALJ found plaintiff had the following severe impairments, "psychiatric conditions variously diagnosed as different disorders including depression." (Tr. 20.) The ALJ committed error at Step Two by failing to determine the exact nature of plaintiff's mental diagnoses. Because the ALJ erred at Step Two in failing to determine plaintiff's precise mental diagnoses, the ALJ was unable to properly evaluate his residual functional capacity. This would have required analysis of plaintiff's signs and symptoms from bipolar affective disorder, general anxiety disorder, ADHD, intermittent explosive disorder, impulse control disorder, Cluster B personality trait, and chronic pain syndrome. (Tr. 256, 348, 355.) On remand, the ALJ must determine plaintiff's precise mental diagnoses, which may include bipolar affective disorder, general anxiety disorder, ADHD, intermittent explosive disorder, impulse control disorder, Cluster B personality trait, and chronic pain syndrome.

2. **Opinion of Treating Psychiatrist Michael Stotler, M.D.**

Plaintiff argues that the ALJ erred in giving "little weight" to the opinion of treating psychiatrist, Michael Stotler, M.D. This court agrees. A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(d)(2); see also SSR 962p, 1996 WL 374188, at *2 (Social Security Administration, July 2, 1996). Unless the treating physician's opinion is unsupported by medically acceptable clinical or diagnostic date, the opinion of a treating physician is "entitled to great weight." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007). A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). See Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (ALJ may discount a physician's opinion if the opinion is internally inconsistent).

In this case, the ALJ stated he gave Dr. Stotler's opinion "little weight" for several reasons. The ALJ noted that Dr. Stotler treated plaintiff on only three occasions during the period between October 22, 2012 and February 12, 2013, the date of his medical source statement. Second, the ALJ stated that Dr. Stotler's examinations did not support his opinion because he usually noted plaintiff appeared depressed and anxious, but also noted that plaintiff was alert, oriented, well-groomed, logical and coherent with appropriate dress and good eye contact. Third, the ALJ stated that Dr. Stotler's opinion was not supported by other examinations that revealed the claimant was alert, oriented, calm, well-groomed and in no apparent distress. The ALJ stated that one examiner noted that plaintiff's affect and demeanor were appropriate. He also stated that Dr. Stotler's opinion was "contrary to the concerns of some that the claimant exaggerated his symptoms." (Tr. 26.)

If the ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007); 20 CFR § 404.1527(c)(2). The ALJ did not give good reasons here.

Dr. Stotler saw plaintiff on three occasions prior to his medical source statement. His observations were consistent with the recurrent symptoms of bipolar affective disorder and anxiety. Dr. Stotler was the only treating source who provided an opinion regarding plaintiff's ability to function in the workplace. His opinion was consistent with his own notes and treatment, which included modifications to multiple medications. Moreover, Dr. Stotler's opinion was not inconsistent with the other substantial evidence of record, including four psychiatric hospitalizations. (Tr. 267-74, 288, 304-22, 407-24.) See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (absent information from the treating sources, it is not possible to ascertain a claimant's ability to work without engaging in medical conjecture); Dixon v. Barnhart, 324 F.3d 997 (8th Cir. 2003) (ALJ may not draw upon his own inferences from medical reports.)

The ALJ noted that Dr. Stotler observed that plaintiff's mood and affect were depressed and anxious, supporting a finding that Dr. Stotler's treatment notes were consistent with his opinion that plaintiff suffered from bipolar affective disorder and

anxiety. However, the ALJ failed to provide support for his conclusion that the symptoms of bipolar affective disorder or anxiety were inconsistent with being alert, oriented, well-groomed, logical, coherent or appropriately dressed with good eye contact. (Tr. 26.) This constitutes medical conjecture on the part of the ALJ. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a "good day" does not imply that the condition has been treated. Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011).

For example, the ALJ stated, "[o]n December 21, 2012, Mineral Area Regional Medical Center admitted the claimant after he stabbed his wrist during an argument with his son. Examination did not reveal signs indicative of his reported symptoms, and he reported his mood to be good. He was discharged December 26, 2012 (Exhibit 10F)." (Tr. 24.)

However, contrary to the ALJ's statement, Dr. Adejoh described plaintiff's act as a "suicide attempt," and stated that his insight and judgment were impaired, and that a five to seven day hospital admission was warranted. (Tr. 304-05.) Critical care specialist Dr. Grissom also agreed that plaintiff's condition warranted in-patient hospitalization. (Tr. 312.) Thus the ALJ erred in concluding that the admitting examination did not reveal signs indicative of a suicide attempt requiring in-patient hospitalization.

The ALJ also concluded that Dr. Stotler's opinion was not supported by "other examinations," referencing treatment notes from December 2009 through December 21, 2011. (Tr. 26, 228-36.) On December 21, 2011, plaintiff reported that Adderall would "wear off around noon." The provider who signed this treatment note diagnosed ADHD, lumbago, muscle spasms, and anxiety, and confirmed that another provider had refilled Adderall, Soma, and Valium. (Tr. 229.) This treatment note does not provide support to discredit Dr. Stotler's opinion.

The ALJ also referenced the physical consultative evaluation from Guy Roberts, D.O., in which Dr. Roberts diagnosed chronic pain syndrome and anxiety, and found no physical reason why plaintiff could not work. (Tr. 256.) This physical evaluation from a

consulting examiner does not provide support for the ALJ's decision to discredit the opinion of Dr. Stotler. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (opinion of consulting physician less valuable than that of treating physician and not entitled to special weight afforded opinion of treating physician).

The third reason given by the ALJ for his reason to discredit Dr. Stotler's opinion was that Dr. Stotler's opinion was "contrary to the concerns of some that [plaintiff] exaggerated his symptoms." (Tr. 26.) The record evidence shows that Dr. John Lake, the psychiatrist who examined plaintiff upon his September 3, 2012 hospital admission, was the only person who questioned plaintiff's motive. Specifically, upon his September 3, 2012 admission, Dr. Lake diagnosed bipolar affective disorder and rule-out malingering. He assessed a GAF score of 45-50. Upon discharge on September 6, 2012, Dr. Lake diagnosed bipolar affective disorder, depressed episode. Notably, at discharge, Dr. Lake did not diagnose malingering or state that he wanted to rule-out malingering. (Tr. 324-27.) Because Dr. Lake removed the diagnosis of rule-out malingering from his final diagnosis, the ALJ's theory that "some" were concerned about malingering is not supported by the record evidence as a whole. The court notes the ALJ used the word "some," in reference to one physician, even though no other treating source questioned plaintiff's motives.

The ALJ also rejected Dr. Stotler's opinion without properly considering the factors set forth in 20 C.F.R. § 404.1527(c)(1)-(6), specifically, Dr. Stotler's specialty in psychiatry, and the fact that Dr. Stotler was aware of plaintiff's other treatment, including his psychiatric hospitalizations and suicide attempts. (Tr. 279, 282, 285.) Dr. Stotler's familiarity with the other information in plaintiff's case record was a relevant factor that the ALJ should have considered when determining the weight to afford his opinion. See 20 CFR § 404.1527(c)(6) (factors to consider include length and frequency of physician-patient relationship, the nature and extent of the treatment relationship, supportability, consistency, expertise, and other factors.) The record evidence here contained no other medical assessments that were "supported by better or more thorough medical evidence" than that of Dr. Stotler. See Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995).

14

For all of the above reasons, the court concludes the decision of the ALJ is not supported by substantial evidence on the record as a whole.

## V.  CONCLUSION

For the reasons set forth above, pursuant to Sentence 4 of 42 U.S.C. § 405(g), the decision of the Commissioner is reversed and the case is remanded for further proceedings consistent with this memorandum opinion.

An appropriate Judgment Order is issued herewith.


**UNITED STATES MAGISTRATE JUDGE**

Signed on August 22, 2016.